IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHANNON M. CAIRNS,

                           Plaintiff,                       OPINION AND ORDER

     v.

                                                   08-cv-487-slc

UNITED PARCEL SERVICE,

                          Defendant.

---

In this civil rights action brought pursuant to Title VII of the Civil Rights Act of 1964, plaintiff Shannon Cairns alleges that defendant United Parcel Service (UPS) discriminated against her because of her sex in terminating her employment as a driver. Before the court is defendant's motion for summary judgment.

Having determined the undisputed material facts from the admissible evidence submitted by the parties and having applied the governing law, I conclude that plaintiff has not established a prima facie case of discrimination, and that even if she had, plaintiff has not established that defendant's stated reason for firing her was pretextual. Therefore, I am, granting defendant's motion for summary judgment.

Step one is to determine which material facts are not genuinely disputed. Plaintiff has attempted to dispute several of defendant's proposed findings of fact concerning discussions at the meeting preceding her termination and defendant's beliefs about the reasons for her termination; plaintiff, however, has not cited proper evidence to put these facts into genuine dispute, instead relying on conclusory or self-serving statements unsupported by other evidence in the record. For example, several of defendant's employees aver that they believed that plaintiff purposely deceived defendant about the failed delivery of a package and that  plaintiff

attempted to cover her tracks by falsely recording this package as having been delivered. Def.'s PFOF ¶¶ 110-111, dkt. 16. Plaintiff attempts to dispute these averments by citing her own deposition testimony that defendant wanted to get rid of her because of her gender. Pl.'s Resp. to Def.'s PFOF 110-111, dkt. 28. But self-serving assertions unsupported by facts in the record do not create a factual dispute sufficient to defeat a motion for summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining* & *Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter; rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). This same principle undermines the general statements made by plaintiff's witnesses, Desirea Fetkenheuer and Lindsey Glessing, that they believed defendant discriminated against them and plaintiff.

Plaintiff challenges defendant's proposed findings of fact about her termination meeting on the ground that these proposed facts improperly rely on the notes of Brett Novotny, a supervisor. Specifically, plaintiff disputes defendant's proposed facts "inasmuch as [they cite] to Mr. Novotny's April 20, 2007 typewritten notes, as those notes directly conflict with the handwritten notes he took contemporaneously on March 30, 2007." Pl's. Resp. to Def.'s PFOF 119-159, dkt. 28. Plaintiff fails to explain how the documents conflict; a comparison establishes that the documents, while not identical, are substantially and materially consistent. *Compare* dkt. 33, Exh. A *with* dkt. 20, Exh. A. Plaintiff does not raise any specific objection to the admissibility of this evidence beyond asserting that it is unreliable. This is an insufficient basis to disregard Novotny's notes.

Finally, plaintiff cannot create a factual dispute regarding defendant's version of what occurred during the termination meeting simply by claiming that she does not recall what happened, *see id.* at ¶¶ 119-159. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735-36 (7th Cir. 2002) (statement by witness that he "does not recall" particular event not enough to dispute another witness's testimony that it did happen). Therefore, to the extent that defendant's proposed facts are material, I have considered them as undisputed.

Against this backdrop, from the parties proposed findings of fact and the record, I find that the following facts are undisputed:

## FACTS

### I. The Parties

Defendant UPS is a package delivery company and provider of specialized transportation and logistics services. Its operations in the United States are divided into districts, including the Wisconsin District, which encompasses most of the state of Wisconsin and a portion of Michigan's Upper Peninsula. Districts are subdivided into geographic divisions that contain package distribution centers. Centers coordinate work at the ground level, including picking up and delivering packages to customers in an assigned geographic territory.

Plaintiff Shannon Cairns began working for defendant as a part-time loader and unloader in the Rice Lake distribution center on May 5, 1999. In 2004, she was promoted to the position of package car driver. In that position, she worked as one of the signature brown-clad drivers who deliver packages to customers' homes and businesses.

The Rice Lake Center is part of the UPS Wisconsin District's Northwoods Division. Kevin Church is the division manager.  Since March 28, 2007, Jacob Shope has been the business manager of the Rice Lake Center.  When Shope took that position, plaintiff was the only female driver in that facility.  After plaintiff was terminated, there were no other female drivers at the Rice Lake facility.

## II.  Plaintiff's Position and Duties

Package car drivers fall generally into three classifications for purposes of delivery route assignment:  bid route drivers, bid coverage drivers and unassigned drivers.  Plaintiff worked as an unassigned driver during her entire employment with defendant.  Defendant assigns unassigned drivers to routes and duties on a day-to-day basis.

Plaintiff's duties required her to maintain accurate company records regarding the packages she delivered and picked up every day.  Accurate recordkeeping allows defendant's customers to track their packages in transit, assists defendant and customers in delivery disputes, permits defendant to assess the productivity of its drivers and whether dispatch changes need to be made to a driver's route, and ensures that customers receive their packages when promised. When plaintiff was promoted to driver, she attended a week-long "Service Provider Training School," at which she received training and written materials about defendant's delivery methods.  As part of her training, she learned how to use a hand-held computer called a "Delivery Information Acquisition Device" (or DIAD) as a means to record information concerning delivery stops, package deliveries and pick-ups.  Drivers use the DIAD to scan a barcode label on each package when it is either delivered or picked up.  When a barcode is

4

scanned for a package delivery, data is transmitted to defendant's package delivery electronic network showing the time the package was delivered, the location of the delivery, whether a signature was obtained (if required) and the ultimate delivery status (i.e., delivered, undelivered, or missed). The process of scanning a package often is referred to as "sheeting."

Defendant instructed plaintiff how to deal with the following specific situations that might arise while delivering packages:

- When a driver does not attempt to deliver a package that is out for delivery, the package should be entered into the DIAD as a "missed package."

- Any commercial business delivery that is attempted outside of normal business hours (i.e., before 9:00 a.m., between 12 and 1:00 p.m. or after 5:00 p.m.) is a deemed a missed package if the attempt to deliver it is not successful.

- If a driver unsuccessfully attempts a commercial business delivery between 12 and 1:00 p.m., the driver is required to make another delivery attempt the same day during normal business hours.

- If for some reason a commercial delivery could not be re-attempted or delivered, drivers must notify distribution center management of the service failure.

- Drivers who miss a delivery must call the Rice Lake Center as soon as possible so that the center can determine the best course of action concerning the package. Center personnel might instruct the driver to return to the delivery destination to re-attempt delivery, send out another driver to pick up and deliver the package or instruct the driver to bring the package back to the center at the end of the driver's shift.

- If a package cannot be delivered, a driver is expected to physically mark the package with a "service cross," indicating that an attempt to deliver was made. A service cross indicates the date of the attempted delivery, the driver's initials, the reason the package was undeliverable (e.g., closed, not in, no such street, no such person, refused, etc.) and the time the attempted delivery was made.

5

- If a driver delivers a package to a wrong address and retrieves it, she must void the delivery in the DIAD or record the event as a duplicate stop in the DIAD. The driver must then deliver the package to the correct location, recording the stop by following the standard recording methods.

Instruction concerning proper delivery methods, including the procedures for missed and wrongly delivered packages, is regularly reinforced with all drivers in the Rice Lake Center. Each morning drivers attend a pre-work communication meeting, which often covers proper delivery methods, including the expectation that drivers communicate with the center concerning missed deliveries.

Plaintiff was a member of the International Brotherhood of Teamsters, Local Union No. 344 during her employment with defendant. Plaintiff's employment was governed by a collective bargaining agreement negotiated between defendant and the union.

## III.  Defendant's Honesty Policy

Defendant has a written "Honesty in Employment" policy that states:

> WE INSIST UPON INTEGRITY IN OUR PEOPLE. We present our company honestly to employees and, in turn, expect them to be honest with us . . . We expect our people to be honest with respect to intangible things as well in the time, effort, and full performance of their jobs; in fair play in dealing with others; and in the acknowledgment of mistakes or other shortcomings. The great majority of our people are of high moral character. However, when we do discovery a dishonest person in our organization, we deal with that individual quickly and firmly.

Plaintiff read, understood and signed this policy.     Under the  union contract, drivers are subject to immediate termination for any act of dishonesty without the company first having to go through progressive discipline with the employee. Defendant believes that any act of dishonesty

6

is so serious that even an employee with an otherwise flawless record may be discharged for a first violation of the honesty policy.  Plaintiff knew that any act of dishonesty could result in her dismissal.

## IV.  Warnings to Plaintiff

On several occasions, plaintiff was disciplined and coached regarding missed deliveries and proper recordkeeping practices.  On July 7, 2006, management instructed plaintiff to "call in missed pieces" by 3:00 pm each day and "call in late next-day air ASAP."  On October 6, 2006, management spoke with plaintiff about four delivery issues:  (1) on September 28, plaintiff never attempted delivery on a package and she did not sheet the package as missed; (2) on October 2, she failed to call the center regarding two missed deliveries; (3) on October 3, she never attempted delivery on two packages; and (4) on October 4, she missed two deliveries and failed to notify the center of those missed deliveries.  Church issued plaintiff a disciplinary warning letter advising her that any failure to follow proper delivery methods and procedures would result in further disciplinary action.  Plaintiff understood there could be disciplinary consequences for failure to follow proper delivery methods in the future and believed the warning letter to be serious.

In early December 2006, plaintiff missed seven package deliveries.  On December 5, 2006, Church and two on-car supervisors at the Rice Lake Center, Brett Novotny and Andy Oestreich, met with plaintiff and her union representative to review the missed deliveries and emphasize the need to communicate with the center regarding missed deliveries.  Church, Novotny and Oestreich told plaintiff that she needed to be clear with management about what

was going on while she was out on the road.  Plaintiff knew the meeting was disciplinary in

nature and that she could be disciplined if she failed to communicate her missed deliveries to the

Rice Lake Center.

**V.  Plaintiff's Termination**

    **A.  The Missed March 27, 2007 Delivery**

On March 27, 2007, plaintiff was assigned a delivery route in and around Rice Lake,

Wisconsin, a geographic area with which she is familiar.  During her route, she made a delivery

to a commercial business named Bargain Bills.  Some time later that day, plaintiff discovered a

package that should have been delivered to Bargain Bills but which, she claims, must have been

loaded in the wrong area of her package car.  At the time she discovered the package, plaintiff

estimates that she was two to three miles from Bargain Bills.  She made no attempt to notify the

center of the missed delivery.  Instead of calling the Rice Lake Center or driving back to Bargain

Bills to deliver the package, plaintiff determined that she would deliver the package on her way

back to the center at the end of her shift.  At approximately 5:09 pm, plaintiff made a delivery

to a residential address.  While at that stop, she sheeted the Bargain Bills package as being

delivered to the residential stop, along with two other packages.  When she noticed the error,

she carried the Bargain Bills package back to the package car.

Plaintiff did not know how to correct the erroneous scan on her DIAD board.  The scan

suggested that the Bargain Bills package had been delivered when it had not in fact been

delivered.  She did not contact the Rice Lake Center to receive instruction on how to correct the

erroneous scan on her DIAD board or to notify them that she had missed the Bargain Bills

8

delivery.  On her way back to the center, plaintiff did not attempt to deliver the package to Bargain Bills.  Instead, while sitting in her package car, she wrote a service cross on the package indicating that she had attempted delivery but that the business had been closed.  Plaintiff only assumed Bargain Bills would have been closed but never made any attempt to find out when the store actually closed.  Plaintiff then put the package back in the package car.  She believed it more than likely that she would be driving the same package car on March 28, 2007.  Plaintiff made no attempt to notify UPS management about the package after she returned to the center. On March 28, 2007, plaintiff delivered the Bargain Bills package to the customer but did not record the delivery in any way or notify the center to let defendant know that she had released the package to Bargain Bills.  To this day, defendant has no records showing proof of delivery to Bargain Bills—it only has a record showing that the package was released to the wrong address on March 27, 2007.

### B.  Investigation and Termination

On the morning of March 28, 2007, defendant conducted a pre-scan audit of approximately 1,000 packages on 21 package cars loaded for deliveries that day.  Defendant conducts pre-scan audits when it has reason to believe that there is a problem with a particular driver or when it wishes to perform a sporadic spot check on some or all of its drivers.  The audit showed that one package on plaintiff's package car (the Bargain Bills package) had not been scanned on March 28 as compared to delivery records.  On March 29, 2007, Novotny, an on-car supervisor, notified Shope of the audit result.  Shope immediately commenced an investigation. Because Shope had been working in the Rice Lake Center for only two days and was unfamiliar

9

with the geographic area, he drove to Bargain Bills with Novotny and spoke to the store manager, who stated that the store still had the package in its possession. Shope also learned that Bargain Bills does not close until 6:00 p.m. Shope and Novotny next drove to the residential address where records indicated the package had been delivered, approximately 2 miles from Bargain Bills. Later that day, Shope reviewed the situation with his immediate manager, Church, and the District Labor Manager, Mike Christensen. As district labor manager, Christensen is involved in and must approve every termination of a union member in defendant's Wisconsin District.

On March 30, 2007, Shope met with Cairns and her union steward, John Lorscheter, in his office. Church was present via telephone. Shortly after the meeting began, Christensen, who has an office across from Church, joined in on the meeting via telephone. Novotny attended the meeting to take notes. On April 20, 2007, he reduced his contemporaneous handwritten notes to a typewritten document.

At the meeting, Shope asked plaintiff whether anyone had ever talked to her about delivery scans. Plaintiff replied, "No, not that I'm aware of." Shope then showed her a copy of the disciplinary warning letter she received in October 2006 concerning UPS's expectation that she follow the company's delivery methods. She replied "I guess I was there then." Shope showed plaintiff a copy of her employee mentions list, a document showing defendant's disciplinary and coaching efforts for each employee, and reviewed the conversation that occurred on December 6, 2006 concerning seven missed deliveries and plaintiff's obligation to notify the center of missed deliveries. When Shope asked plaintiff what the consequences were when the center did not know about missed deliveries, plaintiff responded that she did not know. Shope

10

gave plaintiff the tracking information for the Bargain Bills package and asked her whether she knew what it was.  At first she stated that she did not know.  However, after Shope showed her the actual package, she stated "Oh, Bargain Bills, I must have missed it."  Plaintiff denied knowledge of the package and stated that "there is a lot of stuff going there each day."  After the meeting had ended and plaintiff left the interview room, she remembered the package.

During the meeting, Shope told plaintiff that he would give her the opportunity to tell the truth, and that if she did not, she would be terminated.  Church then instructed Lorscheter to take plaintiff into the hallway to tell her to come clean about the package or be discharged. Plaintiff and Lorscheter met in the hallway for a few minutes, and he told her that if she needed to talk and get anything out in the open, now was the time to do it.  When plaintiff returned to the interview room, she told Shope that she did not remember exactly what had happened with the Bargain Bills package.

Shope continued to question plaintiff about the package, asking her how the package got back into her package car after records showed it was delivered to a residential address two miles away and why the package had a service cross with a "closed" disposition on it.  Plaintiff responded that she did not know.  After further questioning, plaintiff stated that "I don't do things exactly how you want them. You have all these rules," and added that she gets "a little distracted."  Shope then showed plaintiff her March 28 delivery records and asked whether the Bargain Bills package was there.  She replied that it was not.  When Shope asked "The package gets driver released on March 27, gets back into your car, you don't record it on Wednesday, March 28, do you see how this looks fishy?," plaintiff stated that "I don't remember, the job is stressful, I can't do everything."

11

Plaintiff was fired at the end of the March 30 meeting.  However, prior to the March 30 meeting, Shope directed Novotny to speak with another delivery driver, Brian Melendez, about delivering packages on plaintiff's route for that day.  (The parties dispute whether Novotny told Melendez that he *would* (versus *may*) be making regular deliveries with Shope that day on the route to which plaintiff would have been assigned.)  Although Shope stated that it was a collaborative decision to terminate plaintiff, Christensen stated that it was his decision alone to terminate her.  Plaintiff does not know who made the decision to terminate her.

Church issued plaintiff a termination letter on Mach 30, 2007, stating the reason for her termination was dishonesty.  Defendant believed plaintiff was not telling the truth and was hiding a missed delivery because:

1. Plaintiff recorded the Bargain Bills package as delivered to a residential address on March 27;

2. Plaintiff had not delivered the package to the residential address as she had represented she did;

3. Plaintiff placed a service cross on the package indicating she had made a delivery attempt to Bargain Bills but that the store had been closed; however, Bargain Bills did not close until 6:00 p.m.; and

4. Plaintiff delivered the package to Bargain Bills the following day without recording any information about the delivery.

## C.  Plaintiff's Grievances

The union contract dictates the circumstances under which a member can be disciplined or discharged.  It also provides a grievance procedure through which a union member may challenge any disciplinary action taken by defendant.  The first step in the grievance process is

for the employee's union steward and supervisor to meet within five days of the grievance filing to attempt to resolve the grievance. If the grievance remains unresolved, the next step is a local level hearing at which the union business agent meets with defendant's district labor manager to attempt resolution of the grievance. If the grievance remains unresolved, the matter is next submitted to the state committee panel comprised of equal numbers of union and UPS representatives. The state committee proceedings are formal, involving both parties' presentations of their respective cases, the submission of exhibits, rebuttal, and opportunities for questions.

On April 9, 2007, plaintiff filed a grievance under the union contract, contesting her discharge. On April 12, Shope met with plaintiff's union representatives and denied the grievance. Shortly thereafter, plaintiff had her local level hearing at the Rice Lake Center. She believed that it was important to tell the truth. At that hearing, plaintiff and her union representatives continued to deny that she had any knowledge concerning the Bargain Bills package. Based on plaintiff's continued denial of any knowledge concerning the package, in the face of what defendant believed to be overwhelming evidence demonstrating that she was trying to cover up the fact she missed a delivery, defendant denied her grievance.

Plaintiff's grievance proceeded to a state committee hearing on May 3, 2007. Plaintiff believed that it was important to tell the truth to the state panel. She admitted to the panel that she was wrong and dishonest in what she had done concerning the Bargain Bills package. The state panel upheld the discharge.

13

## VI.  Defendant's Treatment of Other Employees

### A.  Employees Discharged for Dishonesty

Between January 1, 2005 and March 30, 2007 in its Wisconsin District, defendant discharged 41 drivers in addition to plaintiff for dishonesty.  Of those, 39 were men and 2 were women.  Shope was involved directly in the discharge of 4 male drivers:  John Ender, Brent Smith, Kevin Neff and James Mullen.  Ender was discharged for dishonesty on February 26, 2007 and brought back to work with his original seniority on March 15, 2007.  Smith was discharged for dishonesty on February 3, 2007 and brought back to work with his original seniority on February 9, 2007.  Both Ender and Smith successfully grieved their discharge through the union's contract grievance process.  Neff was originally discharged for dishonesty on March 13, 2006 and brought back to work with his original seniority on March 21, 2006 because Christensen did not have sufficient evidence to constitute just cause.  Neff was discharged for dishonesty a second time on November 30, 2006 and again brought back to work on February 19, 2007 because he successfully grieved his discharge.  Mullen was discharged on February 14, 2007 but had the benefit of resigning voluntarily after settling the grievance that he had filed.

Of the 42 drivers terminated for dishonesty between January 1, 2005 and March 30, 2007, 32 of them were either brought back to work or were given the benefit of retiring or voluntarily resigning.  Only 10 employees were terminated for dishonesty and not allowed to come back to work, retire or voluntarily resign.  Of those 10, 3 were terminated for lying about not having a valid driver's license and one was terminated for not disclosing that he was a diabetic.

14

**B.  Brad Miller**

Brad Miller has been employed with UPS since 1987, and has been a driver in the Rice Lake Center since 1995.  On May 11, 2007, Miller attempted delivery of a package to a business address.  He recorded the package in his DIAD as an attempted delivery at 12:22 p.m. but put a service cross on the package indicating that the attempt was made at 1:05 p.m.  If Miller had made his delivery attempt at 1:05 p.m., he would not have been required to make a second delivery attempt that day.  A random audit revealed the discrepancy in Miller's recordkeeping.  On May 14, 2007, Church, Oestreich and Novotny held an investigatory meeting with Miller and his union representative to determine why there was a discrepancy in his recordkeeping.  Shope was on vacation and was not present for the investigation.  Miller was questioned several times about why his DIAD records did not match the service cross placed on the package in question.  Miller stated that he did not know.  He then was asked whether he was trying to deceive management by recording the package in the manner that he had.  Miller replied that he was not.  Miller and his union representative then went into the hall to caucus about the situation.  When Miller returned to the room, he told the truth.  Church warned Miller that while he would be given a pass on this situation because he had told the truth, if he was ever caught being dishonest again, he would be disciplined up to and including termination.

**C.  Erik Newhouse**

Erik Newhouse was employed with defendant from October 2003 to February 2009.  He worked as a preloader for several years before becoming a package car driver in July 2007.  Defendant has no record of receiving any complaint regarding Newhouse's sheeting practices,

15

ever speaking to Newhouse about a sheeting discrepancy or issuing any discipline to him related to recordkeeping or missed deliveries.

### D.  Desirea Fetkenheuer

Desirea Fetkenheuer was employed at defendant's Rice Lake facility between April 1997 and June 2007.  In June 2007, she was a supervisor for the local sort on the evening shift and reported to Oestreich and Novotny.  (The parties dispute whether approximately 2 weeks after Shope became the business manager in March 2007, he asked Fetkenheuer on a daily basis whether she had made a decision whether she was going to quit or be fired.  Shope denies this and avers that he had placed Fetkenheuer on a performance improvement plan and followed up with her.)  Because Fetkenheuer got fed up with Shope's comments, she told him that she was going to make a complaint about him to the human resources department.  The following day, she called into work sick.  However, she ended up going to work because she was told that she needed to meet with Shope.  That day, Fetkenheuer met with Shope, Church and an individual who was on the telephone.  Shope gave Fetkenheuer the ultimatum of resigning voluntarily with her vacation being paid out or being terminated with no benefits.  She decided to accept the offer because she needed the money and was afraid that defendant would give her a terrible reference if she did not resign.

### E.  Lindsey Glessing

Lindsey Glessing was a seasonal package delivery driver with UPS from 2004 through 2006.  Glessing worked the summertime months and over Christmas in 2006, and defendant

offered her the seasonal summertime position, beginning in May 2007, which she accepted. Prior to May 2007, Glessing's offer was rescinded because of her driving record. (The parties dispute who rescinded the offer and whether Glessing spoke with Oestreich about it.) At the time, Glessing had only 2 incidents on her driving record: 1) in or around 2005, she sprained her ankle while performing the job duties of a package delivery driver and 2) in or around 2006, her delivery truck was scratched by an overhang on a building while she was out delivering packages. After the accident with her truck, plaintiff went through a retraining program with defendant and signed a document concerning driver error. At the conclusion of the 2006 Christmas season, Oestreich and Novotny told Glessing that she would be offered a job or the summer of 2007.

## ANALYSIS

Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff alleging a violation of Title VII may establish discrimination in one of two ways: by presenting a "convincing mosaic" of direct or circumstantial evidence under the direct method of proof or by utilizing the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Burks v. Wisconsin Dept. of Transportation*, 464 F.3d 744, 751 (7th Cir. 2006). Plaintiff relies on the indirect method of proof.

To prevail on a sex discrimination claim using the indirect method, plaintiff must present evidence tending to show that: (1) she was a member of a protected class; (2) she was meeting

defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated individual outside of the protected class. *Burks*, 464 F.3d at 750-51. If plaintiff can make a prima facie case with respect to all elements, the burden shifts to defendant to offer a nondiscriminatory reason for its actions. *Id.* Once the defendant proffers such a reason, the burden shifts back to plaintiff to show that the reason is pretextual. *Id.* "Although the burden of production shifts under [the indirect] method, 'the burden of persuasion rests at all times on the plaintiff.'" *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (quoting *Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 280 (7th Cir. 1985)). Defendant is entitled to summary judgment unless plaintiff introduces evidence from which a reasonable jury could conclude that the non-discriminatory reason put forth by defendant is a lie. *Shager v. Upjohn Company*, 913 F.2d 398, 401 (7th Cir. 1990).

Defendant argues that plaintiff cannot state a prima facie case with respect to the second and fourth prongs and even if she can, she has not adduced sufficient evidence to show that the stated reasons for her termination were lies. Defendant is correct.

## I. Prima Facie Case

### A. Job Performance

As evidence that plaintiff was not meeting defendant's legitimate expectations, defendant cites the fact that on March 27, 2007, plaintiff ignored her training experience and prior warnings about deliveries and sheeting practices, failed to call in a missed delivery, lied about attempting a delivery and the business being closed, sheeted the package as being delivered to

another address, delivered the package the next day without making a record of it and lying about the matter when later questioned about it.  Plaintiff admits that defendant spoke to her about its delivery and recordkeeping practices and provided her with guidance on her performance from time to time, as it did with several employees.  She asserts that the only relevant expectation was that she tell the truth, which she claims she did.

Plaintiff' assertion of truthfulness is important because what matters in a discriminatory discharge case is whether the employee  was meeting the company's expectations at the time of her discharge as opposed to her past performance,  *See Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946 (7th Cir. 2006) (citing *Cengr v. Fusibond Piping Systems, Inc.*, 135 F.3d 445, 453 (7th Cir. 1998); *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)).  But simply asserting that she was truthful isn't enough: plaintiff "must specifically refute the facts which allegedly support the employer's claim of deficient performance."  *Cengr*, 135 F.3d at 453 (quoting *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir. 1995)).  Plaintiff has failed to do this.

Plaintiff presents no evidence refuting defendant's evidence that she was dishonest.  She simply relies on her responses to defendant's proposed findings of fact regarding the investigatory meeting about the Bargain Bills package in which she states that she does not recall certain events.  Plaintiff has not proposed any findings of fact telling her side of the story, probably because she asserts that she cannot remember much of what happened. As noted above, a failure to remember does not create a factual dispute.

From the undisputed facts in the record before this court, no reasonable jury could conclude that plaintiff was meeting defendant's expectations of honesty.  Plaintiff had been well

trained in defendant's delivery and sheeting methods, had been corrected for past mistakes and knew how important the honesty policy was to defendant.  Given plaintiff's actions with respect to the Bargain Bills package on March 27 and her persistent denials of recollection of those actions only two days later, a jury could not reasonably infer that plaintiff was meeting defendant's legitimate job expectations.

Plaintiff's overall theory about defendant's honesty policy appears to be that defendant used it as a sham to hide its discriminatory purpose in firing her.  Although plaintiff does not make the argument, I note that in limited circumstances, a plaintiff may be able to meet the second part of the prima facie case without showing that she met her employer's legitimate expectations.  *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 n.8 (7th Cir. 2008) (where plaintiff argues that  employer's discipline meted out unevenly, "legitimate expectations" inquiry dovetails with "pretext" question); *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002).  To proceed thusly, plaintiff must meet the other criteria for a prima facie case and also demonstrate that the employer's legitimate expectations were themselves pretextual. *Id.* (citing *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799, 807 (7th Cir. 1999); *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1404 (7th Cir. 1996)).  In other words, the prima facie case is subsumed within establishing pretext under *McDonnell Douglas*'s third prong. *Id.*  All this being so, it provides no help to plaintiff.  As discussed below, she has not adduced sufficient facts from which a jury could infer that defendant treated similarly-situated employees more favorably (the 4th prong of prima facie case) or that it used the honesty policy as a pretext for firing plaintiff for a discriminatory reason.

20

**B.  Similarly-Situated Employees**

Even if plaintiff could demonstrate that she was meeting defendant's legitimate expectations by telling the truth, she has failed to adduce evidence sufficient to establish that a similarly-situated male employee was treated more favorably.  A person is similarly situated to a plaintiff if that person is "comparable to the plaintiff in all material respects."  *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844 (7th Cir. 2006) (internal quotation marks omitted; alteration in original).  In the course of this inquiry, the court considers all of the relevant factors, including whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications-provided the employer considered the latter factors in making the personnel decision.  *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).  The Court of Appeals for the Seventh Circuit has warned that this prong does not demand an "unyielding" or "inflexible" "near one-to-one mapping between employees" and that "[e]stablishing a prima facie case should not be such an onerous requirement." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

Plaintiff points to Miller and Newhouse as examples of similarly situated male employees. However, plaintiff adduces almost no facts concerning Newhouse.  We know only that defendant has no record of him being disciplined for dishonesty.  Although plaintiff and Miller allegedly committed similar transgressions with respect to a package delivery, plaintiff continued to deny knowledge of misdelivery, whereas Miller eventually owned up to his mistake. Defendant stated that it fired plaintiff because she lied and continued to cover up her mistakes. Defendant chose not fire Miller because he told the truth.  Since the underlying facts on which

defendant claims to have relied are not genuinely disputed, there are legitimate differences between plaintiff and Miller.  "[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a 'comparable set of failings.'"  *Burks*, 464 F.3d at 751 (citing *Haywood*, 323 F.3d at 530; *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 745 (7th Cir. 2002)); *see also Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005) ("the other employee[] must have engaged in similar—not identical—conduct to qualify as similarly situated").  In this case, defendant has shown that mitigating circumstances distinguished Miller's conduct from plaintiff's conduct.  *Gates*, 513 F.3d at 690.  Further, neither Shope or Christensen was involved with Miller's termination.

Plaintiff also notes that of the 42 drivers who were terminated for dishonesty between January 1, 2005 and March 30, 2007, 32 either were reinstated or were allowed to retire or voluntarily resign.  Although plaintiff had the same job position and responsibilities as these employees, Shope supervised only four of them.  Plaintiff has not demonstrated that these four employees had failings comparable to plaintiff's.  Although Shope also fired these employees for dishonesty, no facts were offered describing their alleged acts or the details of their termination processes.  As a corollary to this, no facts have been presented from which a jury could infer that Shope rehired these employees because they were men.

What we know is that these four employees returned to work or were allowed to resign after successfully grieving their discharges.  Shope, as the direct supervisor, is involved in the initial stage of the grievance process, and Christensen has the decision making authority at the local hearing stage, but the final appeal of a grievance is made to a panel comprised of union and UPS representatives.  "In order to be a relevant comparison, . . . the company, under the third

22

element above, must have voluntarily reinstated these employees." *Hiatt v. Rockwell Intern. Corp.*, 26 F.3d 761, 771 (7th Cir. 1994). We do not know at what stage these four employees were rehired or allowed to resign. Perhaps the company was forced to rehire them when it lost their grievances; if so, then these would not be voluntary rehirings. *Id.* There is insufficient evidence to support the inference that Shope treated similar acts of dishonesty by male employees differently than he treated those from plaintiff. To the contrary, Shope appears to have treated each of these employees the same: he fired them all. Without more, plaintiff has not shown that similarly-situated employees were treated more favorably.

## III.  Pretext

Even if plaintiff could show a genuine dispute whether defendant treated similarly-situated male employees more favorably, she cannot show that defendant's expectation of honesty or its stated reasons for terminating her were pretextual. To establish pretext, plaintiff must show that defendant's explanation for its decision is unworthy of credence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citation omitted). If defendant honestly believed its reason for discharging plaintiff, plaintiff cannot meet her burden. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). This is true even if defendant's reason for firing plaintiff was "foolish or trivial or even baseless"; so as long as defendant honestly believed its reason, then summary judgment for defendant is appropriate. *Id.* (citations omitted); *see also Gates*, 513 F.3d at 691 (court not concerned whether employer was wrong or too hard on its employee).

23

Shope, Church and Christensen all have averred that they believed that plaintiff had attempted to deceive UPS by purposely recording the Bargain Bills package as delivered instead of a missed delivery, and that plaintiff had attempted to cover her tracks by falsely indicating on the package itself that a delivery attempt had been made and the business had been closed. They did not believe plaintiff's claim that she could not recall how she had handled this package only two days after wrongly sheeting it.

Plaintiff responds that Shope had decided to fire her before the March 30 meeting began. In support, she relies on the affidavit of Melendez, who stated that he was told on the morning of March 30 that he *would* be driving plaintiff's route that day. Defendant has disputed that statement, but regardless, this lone fact cannot support the weight plaintiff places on it. Even if Melendez accurately has recalled what he was told, this does not mean that defendant's managers are lying about why plaintiff was fired. This shows only that Shope was secure in his belief that plaintiff was being dishonest and he was planning ahead. So long as Shope really believed that plaintiff was lying, then there was no pretext, even if later he were to be proven wrong.

As additional evidence, plaintiff points to two other women employees who lost their jobs because of Shope. However, plaintiff has not produced any evidence tending to show that Fetkenheuer and Glessing were terminated because of their gender. Defendant provides legitimate reasons for why their employment ended. Although both women refute these reasons, they aver only generally that they believed that Shope was being discriminatory. Without a stated basis for those beliefs, their testimony is not relevant.

24

In sum, plaintiff has failed to adduce sufficient evidence from which a reasonable jury could infer that defendant fired her for a discriminatory reason.  Therefore, I am granting defendant's motion for a summary judgment.


ORDER

IT IS ORDERED that defendant United Parcel Service's motion for summary judgment, dkt. 14, is GRANTED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 21st day of August, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

25